JANVIER, Judge.
At about five o’clock in the morning on November 10, 1951, near Norco, an industrial settlement which is near the eastern or New Orleans end of the Bonnet Carre Mississippi River Spillway, there occurred, as the result of a heavy bank of fog, a series of at least three rear-end motor vehicle collisions, in one of which Mrs. Murrel W. Graves, a guest passenger in one of the cars, sustained serious physical injuries, including fractures of bones of the right ankle and a brain concussion, as well as general body bruises and .contusions.
Alleging that the injuries of Mrs. Graves had been sustained when the car in- which she was seated was struck by a large motor tractor or its trailer belonging to Huff Truck Lines, Inc., and that that collision resulted from negligence of the operator of the truck, an employee of the said truck line, Mr. and Mrs.- Graves brought this suit for damages against the truck line corporation and its liability insurance carrier, Liberty Mutual Insurance Company, and also against Dolese W. St. Germain, the driver of the tractor.
Mrs. Graves prayed for solidary judgment against all defendants in the sum of $20,000, and Mr. Graves, as head of the marital community which existed between himself and Mrs. Graves,'sought recovery of $1,609.37, the amount he alleges he expended for various expenses made necessary by the injuries sustained by his wife.
The defendants filed what their counsel referred to as a general .denial, though they admit that the tractor or trailer of the truck line company did strike the Chevrolet automobile in which Mrs. Graves was seated. They also admit that this resulted from negligence of the employee of the truck line company, but they contend that the blow struck by the tractor was a very slight one and caused no injury to Mrs. Graves, and that her injuries, while admittedly serious, were sustained earlier when ■the Chevrolet automobile in which she was riding on the front seat' crashed into the rear of another car — a Buick- — of a Mr. Phil Alton Browning who had brought his *514 car to a stop in the fog in order that he might investigate still another rear-end collision which had occurred in the road ahead of him and in which two other vehicles ('both Fords) were involved.
After a lengthy trial in the Twenty-ninth Judicial District Court for the Parish of St. Charles,, there .was judgment dismissing the suit of plaintiffs, and the matter comes before us on appeal from that judgment.
There are certain facts which are not in dispute. All of the vehicles, which were involved in the three different accidents, were going in the same direction — from New .Orleans towards Baton Rouge, and each, as it reached a point near the eastern or , New Orleans end of the spillway, ran into a heavy fog bank. The first car in which we are interested was the Buick sedan, owned and driven by Browning. He is an engineer in the employ of the Shell Oil Company. When he reached the fog bank, he reduced the speed of his car and a few moments later brought it to a stop because he noticed another motor car stopped in the road ahead of him and, on alighting from his carche found that there had been a rear-end collision of two Ford cars in the roadway ahead of him. He walked ahead to offer assistance and shortly afterwards, as he was walking back to his own car to move it from the roadway, he saw a fourth car, the Chevrolet in which Mrs. Graves was a passenger, approaching from the rear of his car. Before he could do anything to prevent it, this Chevrolet, driven by Philip R. Mussman, crashed into the rear of his Buick.
Sometime thereafter, while all of these four cars were still in the roadway and after the State Highway Police (referred to as Troopers) had arrived, the Huff tractor, coming from the rear of the Chevrolet, driven by Mussman, also entered the fog bank, and its driver, D olese W. St. Germain, instead of stopping, attempted to pass alongside the Mussman Chevrolet and another car belonging to Mr. Edward Mire, Sr., who, in the meantime, had arrived on the scene. He was only partially successful and some part of this tractor or its trailer struck the Mire car and also the Mussman Chevrolet, causing some slight damage to the Chevrolet.
As we have said,’it is conceded that the driver of the tractor was negligent in not bringing it to a stop or in not avoiding the Chevrolet, but it is asserted by the defendants that the injuries which Mrs. Graves suffered were caused not by that very slight impact, but resulted from the earlier and much more serious crash when the Chevrolet in which she was a passenger struck the rear end of the Buick of Mr. Browning.
Both Mrs. Graves and Mussman stated that Mrs. Graves was not hurt in the collision between the Chevrolet and the Buick. On the other hand, there is much testimony to the contrary and this and the physical facts tremendously preponderate to overcome the testimony offered on behalf of plaintiffs.
In the first place, Mrs. Graves says that her injuries resulted from the fact that she was knocked violently forward into the windshield and glove compartment of the car in which she was riding. Since she was seated in the stationary car when it was struck in the rear by the tractor, we do not require the testimony of experts to show that she would not have been thrown forward by such an impact but would have been thrown backward against the back of the seat on which she was seated. If, on the other hand, when she was seated on the ■front seat, the car in which she was riding suddenly crashed into the rear of the stationary Buick ahead of it, it is equally certain that she would have been catapulted forward into the windshield and instrument panel and glove compartment of the car in which she was seated.
It is shown that the Huff vehicle did not strike the Chevrolet with any appreciable violence. The impact was merely a glancing one, or a “sideswipe” as it is referred to by several of the witnesses. The damage which the Chevrolet sustained as a .result of its contact with the tractor was settled for $15.64, whereas it is shown *515 without contradiction that, as a résult of the crash of the Chevrolet into the rear end of the Browning Buick, the front end of the Chevrolet was damaged to an extent of more than $300 and the repairing of the damage to the rear end of the Buick also cost more than $300.
Mrs. Graves’ testimony is quite remarkable in that, whereas she says that in the first crash in which both cars were severely damaged, she sustained no injury but was only shaken up and became nervous and nauseated, she says that as a result of the second impact, which was of very minor importance, her leg was broken and “the front of the forehead * * * was broken like cracked ice * * * ”; that the bone of her leg “was sticking out” and that her hand was all bloody and “the blood began dripping in the car so that you could hear it.”
Mr. Mussman, too, said that Mrs. Graves sustained no injury in the first crash, but there is overwhelming evidence to the effect that long before the second crash occurred he had told several persons that Mrs. Graves had been badly hurt in the first crash.
State Trooper James Kearney says that he and his associate, Trooper Leonard Ferrara, at 5:15 o’clock in the morning, received the call stating that there had been an accident, and that they arrived at the scene at about 5:40 A.M.; that, at that time, the Huff tractor had not arrived and that, of course, the second crash had not occurred. Kearney says that he first went to the Chevrolet, saw Mrs. Graves sitting in it and that “she' said her ankle was hurt,” and that he then went to call an ambulance.
The other Trooper, Ferrara, says that when he arrived at the scene, he saw Muss-man and asked him if anyone was hurt and that Mussman said that a lady, who was identified by Mussman as his mother-in-law, was seriously hurt and Ferrara added that as nearly as he could remember Muss-man said that “she sustained a broken ankle and head injuries.” He also said that Mussman asked that an ambulance be called and that several times before an ambulance arrived Mussman asked him to “try and hurry the ambulance,” and “kept asking where the ambulance was.” Fer-rara was asked: “Did that all transpire before the Huff truck arrived?” and he answered, “Yes, sir; it did.”
Edward Mire, Sr., a clerk of the Pan-Am Southern Corporation, says that he arrived on the scene and found four cars wrecked — the two for which Browning had stopped his Buick, then Browning’s Buick, then Mussman’s Chevrolet, and that the Huff tractor had not yet arrived. Mire says that the fourth car — Mussman’s Chevrolet — “had piled into the Buick car.” He says that he did not know Mussman but that the man who, in the courtroom was identified as Mussman, said that “my mother-in-law is hurt in there.” That, too, was before the arrival of the Huff tractor and in fact was before the arrival of the police.
Browning, the driver of the Buick, said that when he got -out of 'his car, he applied his brakes .and left it in gear, but that in spite of that it was- struck with so much force by Mussman’s Chevrolet, which was running at a speed of from 25 to 30 miles an hour, that it was knocked forward tec. feet.
At this point it may be well to note that the blow which' the Chevrolet later received from the Huff truck did not move it at all, or possibly, as Browning testified, not more than eight ór ten inches. Browning said that he had walked ahead to investigate the first accident when the Mussman car crashed into his Buick; that he 'heard the crash and went back to the Chevrolet; that he spoke to-Mussman, and that they exchanged names and that Mussman said “that his mother-in-law was hurt — that he thought his mother-in-law had a broken leg.”.
Browning also said that when the Huff tractor arrived and struck the Chevrolet,. Mrs. Graves “started screaming again.” We note word “again” in the quotation because it is contended on behalf of plaintiffs that Mrs. Graves was heard to scream *516 when the Huff tractor struck the Mussman Chevrolet, and it is argued from this that that impact must have been what caused her injuries since she screamed right after its occurrence. We interpret the statement of Browning, however, as meaning that Mrs. Graves had screamed with pain before the occurrence of the second collision and that when the second cdllision occurred, although the impact was slight, it was sufficient to jolt her and to cause her broken ankle to hurt, so that she screamed “again.”
We cannot overlook certain statements which appear in the report of the adjuster whose duty it was to investigate the damage which had been sustained by the Muss-man car. In that report there appears a statement taken by the adjuster from Muss-man and which Mussman signed on September 15th, which was the fifth day after the accident. The significant part of that statement reads as follows:
“'On or about 'Nov. 10, 1951, at about 5:00 AM I was involved in an accident with my 1951 Chevrolet motor #JAA78952 as shown in diagram. In the collision my mother-in-law broke her right leg. The police arrived about 45 minutes after the collision * *
Mussman was obviously referring to the collision between his car and the Browning Buick. It is true that later in the statement he refers to the.Huff tractor and that in the diagram attached to the statement he shows all.of the vehicles which were involved in all three collisions. But we cannot overlook the fact that in the opening •words of his statement he must have been referring to the collision between his automobile and the Browning Buick, because he says that the police arrived 45 minutes after that collision and yet the police, it is conceded, arrived before the arrival of the Huff tractor. It seems certain that Muss-man was referring to that first collision when he said that “in the collision” his mother-in-law had broken her right leg.
The record in ,our opinion leaves possible no other conclusion than that Mrs. Graves’ injuries were sustained long before the Huff tractor arrived on the scene and that, although by a coincidence- that tractor did strike the Mussman car, that impact did not cause any injury to Mrs. Graves.
The testimony of Mussman is overwhelmingly contradicted by disinterested witnesses and physical facts, and the testimony of Mrs. Graves could well have resulted from the fact, that she sustained a very serious injury, including a brain concussion, and that as a result she was confused as to just when her injuries had been sustained. At any rate, not only is the holding of the District Judge not obviously incorrect, but we are convinced that no other conclusion could possibly result from the evidence found in this record.
The judgment appealed from is affirmed at the cost of appellant.
Affirmed.